UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

RICHARD WAILES,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No.  2:16 CV 13 CDP
                                         )
NANCY A. BERRYHILL, Acting               )
Commissioner of Social Security,[1]      )
                                         )
                    Defendant.           )

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Richard Wailes brings this action under 42 U.S.C. § 405(g) seeking

judicial review of the Commissioner's final decision denying his claim for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq.*  Because the Commissioner failed to provide sufficient

reasons to wholly disregard the opinion of Wailes' treating physician, I will reverse

the decision and remand for further proceedings.

## I.  Procedural History

On August 28, 2013, the Social Security Administration denied Wailes'

April 2013 application for DIB, in which he claimed he became disabled on

August 28, 2012, because of back, neck, hand, and shoulder injuries; depression;

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.
Under Fed. R. Civ. P. 25(d), Berryhill is automatically substituted for former Acting
Commissioner Carolyn W. Colvin as defendant in this action.

dyslexia; and arthritis. At Wailes' request, a hearing was held before an administrative law judge (ALJ) on September 15, 2014, at which Wailes and a vocational expert testified. On November 24, 2014, the ALJ denied Wailes' claim for benefits, finding the vocational expert's opinion to support a finding that Wailes could perform work as it exists in significant numbers in the national economy. On January 4, 2016, the Appeals Council denied Wailes' request for review of the ALJ's decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Wailes claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ improperly discounted his subjective complaints and failed to give sufficient reasons to accord no weight to the opinion of his treating physician, Dr. Gessling. Wailes further contends that the ALJ failed to include sufficient walking and standing limitations in the residual functional capacity (RFC) assessment. For the reasons that follow, the matter will be remanded for further proceedings.

## II. Evidence Before the ALJ

A.     Wailes' Testimony

At the hearing on September 15, 2014, Wailes testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, Wailes was fifty-one years of age. He lives in a

house with his wife.  He is a high school graduate.  (Tr. 48-49.)

Wailes' Work History Report shows that Wailes worked from 1998 to 2000 as a school custodian.  From January 2002 through August 2012, he worked as a door assembler for MidAm Building and Supplies.  (Tr. 193.)  Wailes testified that he can no longer work because of problems with his back, neck, shoulders, and hands.  (Tr. 51.)

Wailes testified that he cannot carry things as before and drops things.  He cannot look down or side-to-side because of neck pain.  He gets a headache if he looks up too long.  Wailes testified that his low back pain feels like a knife is being driven into him.  As to his shoulders, Wailes testified that he can hear popping when he moves them and has a burning sensation.  He has carpal tunnel in his hands.  He underwent surgery on the right hand, but continues to experience numbness in one finger.  (Tr. 51-53.)

Wailes testified that his pain worsens when he tries to do normal things, such as gripping a wrench or mow the lawn with a riding mower.  His back becomes sore with mowing, so he takes a break for a bit, takes a pain pill, and lies down.  Wailes testified that he currently takes gabapentin and Robaxin, which help a little.  Wailes testified that he was recently prescribed new medication because his other medication was not working.  His current medication relaxes him and puts him to sleep.  (Tr. 53-55.)

As to his exertional abilities, Wailes testified that he can walk for about thirty minutes before feeling pain.  He uses a cane every day for walking, as advised by his doctor.  He can stand for about fifteen to thirty minutes before he must move around because of throbbing and aching in his low back.  He can sit for about fifteen to thirty minutes before needing to get up and move around.  Wailes testified that he lies down for about two hours when the pain is bad.  (Tr. 56-57.) He can lift a gallon of milk but feels pulling in his shoulders if he lifts twenty pounds.  Wailes testified that he has four bad days a week where he cannot move at all.  (Tr. 58-59.)

As to his daily activities, Wailes testified that he lies down a lot because of his pain.  (Tr. 55.)  He watches television and sits outside on his deck.  His neighbors sometimes come to visit, and friends and neighbors sometimes help him if he needs something done.  (Tr. 61-62.)  He tries to do laundry, but his wife usually does the household chores.  He sometimes tries to make quick and simple meals.  (Tr. 59-60.)  Wailes drives every day to visit his mother.  If he drives longer distances, he stops to stretch his back.  Wailes can manage his personal care but sometimes has difficulty putting on pants or shoes because of his limited ability to bend over.  (Tr. 60-61.)

B.    Vocational Expert Testimony

Stella Doering, a vocational expert, testified at the hearing in response to

questions posed by the ALJ and counsel.

The ALJ asked Ms. Doering to assume an individual of Wailes' age, education, and work history who was limited to "light exertional work with occasional stooping, crouching, crawling, kneeling and climbing, but no ladders, ropes or scaffolding, occasional overhead reaching, frequent fingering, handling and grasping, the need to avoid concentrated exposure to extreme cold, vibration and hazards." (Tr. 63.) Ms. Doering testified that such a person could not perform any of Wailes' past work but could perform light work as a marking clerk, weight recorder, and arcade attendant, with such jobs ranging in numbers from 900 in Missouri to 200,000 nationally. Ms. Doering testified that if this person was limited to sedentary work, there would be no jobs available. Ms. Doering also testified that if this person missed two days of work each month or had to take extra breaks throughout the day, no work would be available. (Tr. 63-64.)

C.    Medical Evidence

The record shows that Wailes experienced left shoulder pain in 2004 for which he underwent an MRI that showed severe left rotator cuff strain, osseous and cartilaginous hypertrophy about the left acromioclavicular (AC) joint, thinning and fraying of the left glenoid labrum with moderate to severe chondromalacia of the left humerus head, moderate subdeltoid and subacromial bursitis, moderate to severe tenosynovitis of the left long head of the biceps tendon, and moderate left

deltoid muscular strain.  (Tr. 275.)  With respect to his relevant impairments, the record is thereafter silent until March 9, 2012, when x-rays were taken of the thoracic spine in response to Wailes' complaint of neck pain.  The x-rays showed no abnormalities.  (Tr. 395.)

Wailes went to the emergency room at Moberly Regional Medical Center on July 22, 2012, with complaints of having left shoulder pain for two days.  He reported waking up with pain and felt a pop when his wife pulled on his shoulder. Moderate tenderness was noted about the shoulder, but range of motion was intact. No tenderness was noted about the spine.  X-rays of the left shoulder showed hypertrophic change of the AC joint and lateral acromial spurring, often seen with impingement and rotator cuff tear.  Wailes was diagnosed with left shoulder ligamentous sprain and was discharged in stable condition.  He was prescribed Naprosyn, Medrol Dosepack, and Norco upon discharge.  (Tr. 386-91, 393.)

Wailes visited Dr. Heather M. Gessling on August 20, 2012, with complaints of headaches, numbness in his arms and hands, and blurry vision.  He also complained of having pain in his neck and shoulders for about a month.  It was noted that Wailes took hydrocodone and Naproxen.  Physical examination showed decreased supraspinous strength, pain with self-impingement and axial loading, and positive Spurling's test with some pain.  Dr. Gessling prescribed Flexeril and Ultram for pain and ordered diagnostic tests.  (Tr. 228-29.)

X-rays of the cervical spine dated August 21 showed mild cervical spondylosis with disc space narrowing and mild osteophyte formation at the C3-4 and C4-5 levels. It was noted that flattening of the cervical curvature may be associated with myospasm. (Tr. 232.) X-rays of the right shoulder showed minimal hypertrophic changes of the AC articulation. (Tr. 231.)

Wailes returned to Dr. Gessling on August 24 and reported having problems with both shoulders and a loss of function of his right arm. He continued to complain of joint and muscle pain. Dr. Gessling referred Wailes to Dr. Timothy C. Galbraith for shoulder pain and arm numbness, and to an orthopedist for neck pain and headaches. (Tr. 226-27.)

Wailes visited Dr. Galbraith on August 28 and reported his bilateral shoulder pain to be constant and at a level nine out of ten. He reported the pain to be sharp and throbbing and radiating to the neck, upper arms, elbows, forearms, and hands. He reported that the pain interferes with his sleep and is aggravated by strenuous activities and activities of daily living. He reported having not obtained any relief. He also reported having headaches and feeling fatigued and depressed. Mental status examination was normal in all respects. Examination of the neck showed paraspinous muscle tenderness to palpation about the cervical spine, but no instability was shown with range of motion. Muscle strength was normal and there was no hypertrophy. Examination of the right and left shoulders showed moderate

tenderness to palpation about the AC joints; normal range of motion; slightly decreased strength; and positive Hawkins test and Whipple test. Cross chest adduction test, Speed's test, push/pull test, and lift off test were also positive. Examination of the elbows, forearms, and wrists were normal, but tenderness was noted about both hands. Dr. Galbraith diagnosed Wailes with bilateral joint pain involving the shoulder, and cervical pain. Degenerative rotator cuff tear, displacement of cervical intervertebral disc, and bilateral carpal tunnel syndrome were to be ruled out. Diagnostic tests were ordered. (Tr. 304-08.)

An MRI of the cervical spine dated August 29 showed central disc protrusion with caudal extruded disc fragment at C5-6 with associated foraminal encroachment, and left posterolateral disc protrusion and subannular tear at C4-5 with prominent left foraminal encroachment. A small caudal extruded disc fragment was suspected at that level as well. (Tr. 279-80.) An MRI of the right shoulder showed mild tendinosis of the subscapular tendon with minimal tendinosis of the supraspinous tendon, and mild degenerative changes of the AC articulation. No definite labral tear could be established. (Tr. 281.) An MRI of the left shoulder showed minimal tendinosis in the anterior fibers of the supraspinous tendon, mild hypertrophic changes of the AC articulation, and minimal effusion of the subdeltoid and subacromial bursa. (Tr. 282.)

Wailes underwent EMG testing on August 30, which showed moderately

severe distal median neuropathy, bilaterally, consistent with bilateral carpal tunnel syndrome. There was no electrodiagnostic evidence of cervical radiculopathy. (Tr. 272.)

Wailes returned to Dr. Galbraith on September 4 and reported that his shoulder pain remained at a level eight or nine. He also reported continued headaches, fatigue, and depression. Physical examination was unchanged. Upon review of diagnostic tests and his examination, Dr. Galbraith diagnosed Wailes with bilateral joint pain involving the shoulder, rotator cuff tendinitis, displacement of cervical intervertebral disc without myelopathy, bilateral carpal tunnel syndrome, and cervical pain. Treatment options were discussed, and it was determined that Wailes would participate in physical therapy and undergo right carpal tunnel release. Wailes was also referred to a spine surgeon. (Tr. 297-300.)

Wailes underwent carpal tunnel release of the right hand on October 2, 2012. (Tr. 239.) He was prescribed Ultracet and Medrol Dosepak for recovery. (Tr. 292.)

Wailes visited Dr. Thomas R. Highland at Columbia Orthopaedic Group on November 5. Dr. Highland reviewed the results of previous tests and noted Wailes to have at least three-level degenerative disc disease with a herniated disc and stenosis, and particularly pretty significant stenosis at the bottom level. Wailes currently complained of worsening neck pain, headaches, radiating pain into his

shoulders, and burning discomfort in his forearms. He rated his current pain at a level ten. An epidural steroid injection was administered to the cervical spine, lowering Wailes' pain to a level eight. (Tr. 348-49.)

After carpal tunnel surgery, Wailes experienced constant numbness in his right index finger with occasional throbbing and feelings of pressure. He visited Dr. Iqbal Khan, a neurologist, on November 15, who suspected median neuropathy with possible regional complex pain syndrome of the right hand. Dr. Khan also noted weakness in the right and left APB muscles, and mild weakness in the right opponens pollicis muscle. (Tr. 266-68, 291.) An EMG performed that same date showed severe right-sided distal median mononeuropathy associated with active denervation and significantly reduced recruitment. (Tr. 270.) Dr. Khan ordered further MRI testing of the wrist and discussed with Wailes the possibility of taking Neurontin. Wailes refused, however, stating that he could currently tolerate the symptoms and wanted to avoid taking medication. (Tr. 268.)

Between September 6 and November 8, 2012, Wailes participated in seven physical therapy sessions for bilateral shoulder pain. Throughout the course of his therapy, Wailes' muscle strength and range of motion improved, but he continued to experience pain at a level ten out of ten. Wailes was given a home exercise program at discharge but was given a poor prognosis. (Tr. 244-63.)

An MRI of the right wrist dated November 27 showed edematous changes

along the flexor retinaculumn and median nerve associated with recent surgery. There was no definite finding of tenosynovitis. Neuritis of other etiology could not be excluded. (Tr. 283.)

Wailes returned to Dr. Highland on December 18 and reported the previous steroid injection helped him for about three weeks. He did not want to undergo additional injections and reported that he wanted surgical intervention. (Tr. 350.)

Wailes was admitted to Boone Hospital Center on January 17, 2013, to undergo surgery on his cervical spine. (Tr. 326-27.) His relevant medical history was noted upon admission, including that he had received a cervical epidural steroid injection in November that provided limited relief for a week or two, and that he had decided in December to undergo surgery to resolve his symptoms of neck and upper extremity pain. He reported that he experienced pain in his upper back and lower back at a level between eight and ten. It was also noted that Wailes experienced depression but took no medication for the condition. Wailes' current medications were Ultram, Aleve, and Tylenol. Physical examination of the cervical spine showed moderate to marked pain and tenderness about the suboccipital region with associated pain and tenderness about the paracervical region, scapulothoracic region, and supraspinatous and middle trapezius muscle region. Limited range of motion was also noted. Examination of the lumbar spine showed limited range of motion and moderate pain and tenderness with palpation

from L1 to S1.  Straight leg raising was negative, but hamstring tightness was noted.  Wailes had no difficulty walking on his heels and toes but reported increased pain in the L1-2 region when walking on his toes.  (Tr. 318-24.)  Wailes underwent anterior cervical discectomy and interbody fusion at the C5-6 level, and an anterior cervical discectomy, osteophytectomy, and interbody fusion at the C3-4 and C4-5 levels that same date and obtained significant improvement.  He was discharged on January 18 with instructions to lift no more than fifty pounds and to continue with isometric exercises.  No sitting restrictions were imposed.  He was given no prescription medication but was instructed to take Tylenol as needed.  (Tr. 314-17.)

Wailes' wife called Dr. Highland on January 29 and reported that Wailes continued to have pain in the cervical spine region.  She reported that he experienced vomiting with his pain medication the night before, which caused increased neck pain and suspected muscle spasm.  Dr. Highland prescribed Flexeril.  (Tr. 368.)

Wailes visited Dr. Highland on March 11, 2013, and reported continued numbness in his right thumb.  He also reported continued neck pain and stated that his symptoms had not improved much, although he no longer had headaches.  He reported that he was doing some walking and exercising.  X-rays showed good initial healing of the cervical fusion at all levels, and Dr. Highland advised Wailes

that he should consider returning to work. Wailes responded that he continues to be limited and has low back problems. Another appointment was scheduled to address these problems. In the meanwhile, Dr. Highland wrote that Wailes could not return to work at that time. (Tr. 369, 375.)

Wailes returned to Dr. Highland on March 26 and reported that he had surgery for a work injury sustained in 1983 and has had low back pain since. He reported his low back pain to be increasing with some pain radiating down his thighs. Wailes reported that the pain increased with walking and affected his sleep. Examination showed normal reflexes, strength, and sensation. Wailes had full range of motion about the hips but with groin pain on the left. Wailes reported having some groin pain if he walks a lot. Straight leg raising was negative. X-rays of the lumbar spine showed severe disc space collapse at L4-5, bone on bone, severe degenerative disease. Dr. Highland also noted related scoliosis measuring seventeen degrees. Wailes told Dr. Highland that he was not interested in treatment options and would rather live with the pain. Dr. Highland recommended that Wailes perform a light duty job and suggested vocational rehabilitation. Dr. Highland wrote a note stating that Wailes could not return to work involving lifting doors, and that this would be a permanent restriction. In a separate note, Dr. Highland wrote that Wailes could not return to work at that time and would be off work permanently. (Tr. 370, 374.)

In a letter addressed to MidAm Building Supply dated March 26, Dr. Highland wrote that Wailes could not return to his job as a door assembler and was permanently restricted to no frequent bending, lifting, and stooping; no lifting more than fifteen pounds; and no prolonged standing.  (Tr. 373.)

On August 5, 2013, Dr. Highland reported to disability determinations that Wailes had a normal gait and could stand/walk for six hours during a work day; could frequently lift and carry ten pounds, and occasionally lift and carry twenty pounds; and should never bend at the waist or perform stoop-like movements.  (Tr. 376.)

On August 8, Wailes underwent a consultative physical therapy evaluation for disability determinations.  He reported having back pain, neck pain, hand pain and numbness, and shoulder stiffness.  He reported his pain to currently be at a level four.  He reported his pain to be aggravated by prolonged sitting, repetitive bending, and standing too long.  To relieve the pain, he lies down in bed and does nothing for a few days.  Wailes reported that he takes Tylenol and cannot afford any other medication.  Physical therapist Jennifer Cushman noted Wailes to be using a straight cane.   Examination showed Wailes to have slightly limited range of motion about the shoulders, elbows, hips, and knees.  He could fully extend his hands but could not make a tight fist with his right hand because of the decreased flexion of the second finger.  Wailes had diminished strength about his upper

extremities.  Wailes had significant limited range of motion about his cervical spine and lumbar spine.  Some muscle weakness was noted about the lower extremities.  Wailes demonstrated decreased hip extension on the right with ambulating.  It was noted that Wailes exhibited only fair effort during a majority of the tests.  Ms. Cushman observed Wailes to sit without discomfort and with proper posture for up to forty minutes.  She concluded that Wailes would not be able to perform lifting and carrying duties in the workplace because of his inability to bend past forty-five degrees and his mild gait deviation.  She opined that he could walk short distances on level surfaces.  She further opined that Wailes may have difficulty handling objects because of right index finger numbness and weakness.  (Tr. 377-80.)

Wailes visited Dr. Gessling on October 29, 2013, and complained of back pain and depressive disorder.  It was noted that he was there for potential disability.  His past medical history was noted.  Examination showed him to be in no acute distress.   He was healthy appearing and well developed.  He was observed to walk with a cane.  Psychiatric and mental status examination was normal in all respects.  Musculoskeletal examination showed normal motor strength and tone, and neurological exam showed normal gait and station.  Dr. Gessling diagnosed Wailes with cervicalgia and prescribed gabapentin.  She also diagnosed him with depressive disorder – noting that he was learning about mood

disorders – and prescribed Celexa. Wailes was instructed to return in two weeks. (Tr. 416-18.) Dr. Gessling completed a Mental Medical Source Statement that same date wherein she opined that Wailes was not significantly limited in any area of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 403-04.)

Wailes returned to Dr. Gessling on November 19 and reported having neck pain, depressive disorder, hypoxemia, and disturbed sleep. He reported not obtaining much relief with gabapentin. Dr. Gessling noted that Wailes submitted his disability paperwork but had received no decision yet. Examination was normal in all respects. Dr. Gessling observed Wailes to ambulate normally. There was no indication that he used a cane. Gabapentin was adjusted, and Wailes was instructed to stop taking Celexa. Flexeril was prescribed to help with sleep. Dr. Gessling instructed Wailes to return in one month. (Tr. 413-15.)

Wailes next visited Dr. Gessling on August 18, 2014, with complaints of continued back pain and cervical radiculopathy, and he asked for something to help with his breathing. It was noted that he needed disability paperwork to be completed. Examination was normal in all respects, except he was noted to have expiratory wheezing. Dr. Gessling noted Wailes to ambulate normally; there was no indication that he used a cane. Dr. Gessling prescribed gabapentin and Robaxin for lumbar pain. Wailes was given Tudorza for COPD and given instruction

regarding saline breathing treatments at home. No follow up appointment was made or suggested. (Tr. 410-12.)

On that same date, August 18, Dr. Gessling completed a Physical Medical Source Statement wherein she reported Wailes' diagnoses to be cervical spinal stenosis-status post fusion, and lumbar herniated disc, with such impairments shown by back pain, leg pain, neck pain, and cervical radiculopathy. She also reported that Wailes experiences numbness in his fingers. She reported that he can sit in a chair normally and does not use a cane. Medical treatment was noted to be gabapentin, Flexeril, and cervical fusion. Dr. Gessling opined that Wailes could frequently lift and carry up to ten pounds but should never lift or carry twenty pounds or more. She opined that he could occasionally balance; should rarely stoop; and should never twist, crouch, crawl, or climb. She further opined that Wailes should rarely reach, handle, finger, and feel with his upper extremities. Dr. Gessling opined that Wailes could sit for twenty minutes at a time for a total of six hours during an eight-hour work day; stand for twenty minutes at a time for a total of less than two hours during an eight-hour work day; and would need to shift positions at will between sitting, standing, and walking. Dr. Gessling further opined that Wailes would need to take an unscheduled ten-minute work break every hour during the day because of pain, numbness, and paresthesia. She reported that Wailes needed to use a cane because of his pain. Dr. Gessling

reported that Wailes experienced bad days with his impairments and would miss work more than four days each month. She also opined that Wailes would be off task about five percent of the workday but could perform low stress work. (Tr. 406-08.)

### III. The ALJ's Decision

The ALJ found Wailes to meet the requirements of the Social Security Act through December 31, 2017, and that he had not engaged in substantial gainful activity since August 28, 2012, the alleged onset date of disability. The ALJ found Wailes' degenerative disc disease of the lumbar spine, status post remote surgery; degenerative disc disease of the cervical spine, status post discectomy and fusion in January 2013; and bilateral carpal tunnel syndrome to be severe impairments, but that they did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.) The ALJ found Wailes to have the RFC to perform light work, "with occasional stooping, kneeling, crouching, crawling, and climbing (but no ladders, ropes, or scaffolding); occasional reaching overhead; frequently fingering, handling, and grasping; and a need to avoid concentrated exposure to extreme cold, vibration, and hazards." (Tr. 15.) The ALJ found Wailes' RFC to prevent him from performing his past relevant work. Considering Wailes' RFC and his age, education, and work experience, the ALJ found vocational expert testimony to support a conclusion that Wailes could perform

other work as it exists in significant numbers in the national economy, and specifically as a marking clerk, weight recorder, and arcade attendant. The ALJ therefore found Wailes not to be disabled at any time from August 28, 2012, through the date of the decision. (Tr. 20-21.)

## IV. Discussion

To be eligible for DIB under the Social Security Act, Wailes must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the

claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial

evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, I must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). I must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).

I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

Wailes claims that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discredited his complaints of pain and failed to provide sufficient reasons to accord no weight to the opinion of his treating physician, Dr. Gessling. Wailes also contends that the ALJ's RFC assessment failed to include sufficient limitations regarding his ability to stand and walk.

A.    Credibility Determination

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating thereto, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the

testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).

Here, the ALJ cited numerous inconsistencies in the record to support her determination that Wailes' subjective complaints were not entirely credible. Because the ALJ's findings are supported by substantial evidence on the record as a whole, I must defer to her determination.

First, the ALJ noted the objective medical evidence of record not to support Wailes' complaints of disabling pain. The ALJ noted diagnostic testing to show degenerative disease of the spine for which he underwent surgery, but that subsequent physical examinations were essentially normal in all respects, with normal reflexes, ambulation, strength, tone, gait and station, and full range of motion about the hips. To the extent the physical therapy consultative examination showed limited range of motion, the ALJ noted the examiner to observe that Wailes gave only fair effort during the exam. An ALJ may make a factual determination that a claimant's subjective complaints of pain are not credible in light of objective medical evidence to the contrary. *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006).

The ALJ further noted Wailes' daily activities to be inconsistent with his complaints of disabling symptoms. The ALJ specifically noted Wailes' Function Report and his wife's Third Party Report to show that he mows the lawn, performs

household repairs, cleans, performs household chores such as vacuuming and laundry, drives, shops for groceries, takes care of pets, watches television, and provides for his own personal care. Because these acts are inconsistent with subjective complaints of disabling pain, the ALJ did not err in her consideration of Wailes' daily activities. *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009). To the extent Wailes contends that the ALJ failed to consider that it takes him longer to perform these activities and must rest afterward, I note that the ALJ assessed Wailes' credibility upon her review of the record a whole, including all of Wailes' reported activities. Where such review shows a claimant not to be as limited as his testimony would suggest, the ALJ does not err in discrediting the testimony. *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010); *see also Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996) (ALJ not required to believe all assertions regarding limitations in daily activities). In addition, given the numerous other inconsistencies in the record from which the ALJ considered Wailes' credibility to be lacking, it cannot be said that the ALJ unduly relied on Wailes' daily activities in making the credibility determination. Substantial evidence supports the ALJ's conclusions regarding Wailes' daily activities, and I defer to those findings.

The ALJ also found Wailes' infrequent and routine treatment to be inconsistent with disabling pain. This finding is likewise supported by substantial

evidence.  After his January 2013 surgery, Wailes visited his surgeon for follow up in March 2013 and not thereafter.  He returned to his treating physician, Dr. Gessling, twice during the fall of 2013, but it was noted that his visit was in relation to his seeking disability.  Only gabapentin was prescribed for pain.  He did not seek or obtain any additional treatment until August 2014, when he returned to Dr. Gessling for disability paperwork.  Gabapentin was again prescribed for pain, as well as a muscle relaxant.  The failure to pursue regular treatment is a basis upon which to discount a claimant's subjective complaints of pain.  *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003).  Because it is within the province of an ALJ to discount claims of disabling pain when the claimant fails to seek ameliorative treatment, *id.* at 967-68, the ALJ did not err in this regard.

Finally, Wailes claims that the ALJ erred when she considered his failure to attend a physical therapy appointment in September 2012 as a basis to discredit his subjective complaints.  I agree that the failure to attend one session does not provide a basis in itself to discredit Wailes' subjective complaints.  However, the ALJ did not rely solely upon this finding in discrediting Wailes' complaints.  Rather, the ALJ considered the entire record, including the medical evidence, Wailes' testimony, observations of third parties and health care providers, daily activities, and the frequency and effectiveness of treatment, and identified numerous inconsistencies upon which she found Wailes' complaints not to be

credible.  Because these inconsistencies are supported by substantial evidence on the record as a whole, the ALJ's isolated statement regarding the one missed physical therapy session does not provide a sufficient basis for me to disturb the ALJ's credibility determination.

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered Wailes' subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility.  Because the ALJ's determination not to credit Wailes' subjective complaints is supported by good reasons and substantial evidence, I must defer to this determination. *Renstrom,* 680 F.3d at 1065; *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

B.      Dr. Gessling's Opinion

The ALJ determined to accord no weight to the August 2014 opinion of Wailes' treating physician, Dr. Gessling, finding that the opinion appeared to be based on Wailes' subjective reports, was inconsistent with her own treatment notes, and was inconsistent with the weight of the medical evidence of record. Because these reasons provide an insufficient basis upon which to wholly disregard the opinion of a treating physician, I will remand the matter for further consideration.

An ALJ should not ordinarily disregard the opinion of a treating physician. *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015). She may do so, however, "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* While the reasons articulated by the ALJ here are potential bases to give Dr. Gessling's opinion less than controlling weight, and indeed limited weight, *see id.* at 1131-32, they are insufficient to give absolutely no weight to the opinion.

Accordingly, I will remand the matter to the Commissioner to reevaluate the weight given to Dr. Gessling's opinion evidence. While the ALJ may reach the same conclusion upon remand, it must be based upon her review of the record and application of the relevant factors in determining what weight to accord opinion evidence. I cannot undergo an independent review of the record myself to find reasons to uphold the ALJ's decision.

> It is a well-settled principle of administrative law that a reviewing court may not uphold an agency decision based on reasons not articulated by the agency itself in its decision. In other words, a reviewing court cannot search the record to find other grounds to support the decision. A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must reverse and remand for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision.

*Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir. 1990) (internal citations and footnote omitted).

Given the ALJ's improper analysis regarding the medical opinion evidence of record, I will not address Wailes' final claim that the medical evidence supports additional standing and walking limitations that the ALJ should have included in the RFC assessment. If necessary, the ALJ may revisit this RFC finding upon remand after proper review of the medical opinion evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2017.